## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| **DEANNA R. LEDUC, on behalf of the ACCT Holdings, Inc. Employee Stock Ownership Plan, and on behalf of a class of all other persons similarly situated,** | |
| **Plaintiff,** | **Case No.** |
| **v.** | **Complaint – Class Action** |
| **MIGUEL PAREDES, PRUDENT FIDUCIARY SERVICES, LLC, CHRISTOPHER J. DEBBAS, JAMES R. GRIFFITHS, and JOHN AND JANE DOES 1–20,** | |
| **Defendants.** | |

## COMPLAINT

Plaintiff Deanna R. LeDuc, by her undersigned attorneys, on behalf of the ACCT

Holdings, Inc. Employee Stock Ownership Plan, and similarly situated participants in the Plan

and their beneficiaries, alleges upon personal knowledge, the investigation of her counsel, and

upon information and belief as to all other matters, as to which allegations she believes

substantial evidentiary support will exist after a reasonable opportunity for further investigation

and discovery, as follows:

## BACKGROUND

1.      Plaintiff Deanna R. LeDuc ("Plaintiff") brings this suit against Miguel Paredes

and his operating company Prudent Fiduciary Services, LLC ("PFS," and together with Paredes,

"the Trustee"), the fiduciary trustee for the ACCT Holdings, Inc. Employee Stock Ownership

Plan (the "Plan" or the "ESOP") when the Plan acquired shares of ACCT Holdings, Inc.

("ACCT" or the "Company") in 2021; John and Jane Does 1–20, shareholders from whom the

1

Plan acquired the stock ("Selling Shareholders"); and Christopher J. Debbas and James R. Griffiths, two of the Selling Shareholders and co-founders and directors of ACCT.

2.      Plaintiff is a participant, as defined by ERISA § 3(7), 29 U.S.C. § 1002(7), in the Plan who was vested under the terms of the written Plan Document—under which the Plan was established and maintained and which was effective as of January 1, 2021—in shares of ACCT allocated to her account in the Plan.

3.      This action is brought under Sections 404, 406, 409, and 502(a) of the Employee Retirement Income Security Act of 1974, as amended ("ERISA"), 29 U.S.C. §§ 1104, 1106, 1109, and 1132(a), for losses suffered by the Plan and its participants caused by the Trustee when it caused the Plan to buy shares of ACCT for more than fair market value and thereby misused the Plan's money to the benefit of Selling Shareholders, and other plan-wide relief.

4.      As alleged below, the Plan has been injured and its participants have been deprived of hard-earned retirement benefits resulting from Defendants' violations of ERISA.

5.      At all relevant times, ACCT was a privately held company and the Plan's sponsor. ACCT adopted the Plan effective retroactively as of January 1, 2021. On December 22, 2021, the Plan, through its trust, the ACCT Holdings, Inc. Employee Stock Ownership Trust ("ESOT"), purchased from Selling Shareholders, directly or indirectly, 17,386,919 shares of ACCT common stock, which represented all of the issued and outstanding common stock of ACCT, for $320,000,000, which was financed by cash paid by the ESOT to Selling Shareholders in the amount of $118,500,000, financed by a loan received from ACCT in the same amount (the "Initial ESOP Company Loan") and note payables issued by the ESOT to Selling Shareholders aggregating $201,500,000 (the "Seller Notes"). ACCT, the ESOT, and Selling Shareholders entered into an assignment agreement on December 22, 2021, whereby ACCT assumed the

ESOT's obligations under the Seller Notes and the ESOT issued to ACCT a note payable in the amount of $201,500,000 (the "Second ESOP Company Loan") and ACCT and the ESOT agreed to consolidate the Initial ESOP Company Loan and the Second ESOP Company Note into one loan in the amount of $320,000,000 (the "ESOP Loan," and the purchase and loan transactions together, the "ESOP Transaction" or "Transaction").

6.     The Trustee represented the Plan and its participants as fiduciary trustee in the ESOP Transaction. It had sole and exclusive authority to negotiate the terms of the ESOP Transaction and to authorize the Transaction on the Plan's behalf. The stock and loan transactions that the Trustee caused the Plan to enter into with parties in interest under ERISA § 3(14), 29 U.S.C. § 1002(14), were prohibited transactions under ERISA § 406(a), 29 U.S.C. § 1106(a).

7.     The ESOP Transaction allowed Selling Shareholders to unload their interests in ACCT above fair market value, for the reasons explained below, and saddle the Plan with hundreds of millions of dollars of debt over a 50-year repayment period to finance the Transaction. The Trustee failed to fulfill its ERISA duties, as trustee and fiduciary, to the Plan and its participants, including Plaintiff.

8.     Selling Shareholders sold shares and were transferred the Plan's money in the ESOP Transaction. Selling Shareholders are liable under ERISA for knowingly participating in the prohibited stock transaction.

9.     Debbas and Griffiths were the founders of the private equity firm Julip Run Capital, LLC ("Julip Run Capital") that founded ACCT and offered its stock for investment by other Selling Shareholders. They are and were at the time of the Transaction the principals and Managing Partner and Senior Partner of Julip Run Capital. They were the founders of ACCT;

Debbas is and was the Chairman of the Board of Directors of ACCT; and Griffiths is and was a Director and the Chief Financial Officer (CFO), Vice President, and Treasurer of ACCT. Debbas and Griffiths were centrally involved in conceiving of, facilitating, and executing the Transaction, and were the ACCT and Julip Run Capital directors, partners, and CFO with access to and knowledge of Company financials and projections, Company control features before and after the Transaction, and other Company information.

10.     John and Jane Does 1–20 had knowledge of their participation in an ERISA-prohibited transaction from information they received as shareholders and as Selling Shareholders from ACCT, Julip Run Capital, and/or the companies' affiliates, officers, directors, partners, employees, and advisors, including Transaction advisors to the companies, and Transaction advisors to Debbas, Griffiths, and/or Selling Shareholders.

11.     Through this action, Plaintiff seeks to enforce her rights under ERISA and the Plan, to recover the losses incurred by the Plan and the improper profits realized by Defendants resulting from their causing prohibited transactions and breaches of fiduciary duty or knowingly participating in the prohibited stock transaction, and equitable relief, including reformation of Transaction contracts, rescission of the Transaction, and removal and enjoinment of the Trustee from acting as a fiduciary for any employee benefit plan that covers or includes any ACCT employees or members of the Class. Plaintiff requests the Trustee be required to restore any losses to the Plan arising from its ERISA violations, Defendants be ordered to disgorge to the Plan any improper profits, that these prohibited transactions be declared void, and any monies recovered for the Plan to be allocated to the accounts of the Class members.

## JURISDICTION AND VENUE

12.     This action arises under Title I of ERISA, 29 U.S.C. §§ 1001 *et seq.*, and is brought by Plaintiff under ERISA § 502(a), 29 U.S.C. § 1132(a), to require Defendants to make good to the Plan losses resulting from their violations of the provisions of Title I of ERISA, to obtain appropriate equitable relief against Defendants, to restore to the Plan any profits that have been made by breaching fiduciaries, parties in interest, or others through the receipt or use of Plan assets in violation of ERISA, and to obtain other appropriate equitable relief and legal remedies in order to redress violations and enforce the provisions of ERISA.

13.     This Court has subject matter jurisdiction over this action pursuant to ERISA § 502(e)(1), 29 U.S.C. § 1132(e)(1), and it has original jurisdiction pursuant to 28 U.S.C. § 1331.

14.     Venue is proper in this District pursuant to ERISA § 502(e)(2), 29 U.S.C. § 1132(e)(2), because the Plan is administered in this District, because some of the events or omissions giving rise to the claims occurred in this District, and because a defendant resides or may be found in this District. The Plan is administered in Berwyn, Pennsylvania.

## PARTIES

15.     Plaintiff Deanna R. LeDuc is and has been a Plan participant, as defined in ERISA § 3(7), 29 U.S.C. § 1002(7), since the effective date of the Plan. Plaintiff resides in Greeneville, Tennessee. She was a Supervisor at ACCT's subsidiary, Advanced Call Center Technologies, LLC. She was employed there from October 14, 2019 to November 29, 2023. She was vested in shares of ACCT in her Plan account.

16.     Defendant Miguel Paredes is and was at the time of the ESOP Transaction the President, founder, and owner of PFS. His business address is Prudent Fiduciary Services, LLC, 100 N. Barranca St., Suite 400, West Covina, California 91791.

17.     Defendant Prudent Fiduciary Services, LLC ("PFS") is a California Limited Liability Company. It is a provider of ESOP trustee and ERISA compliance consulting services related to employee benefit plans such as qualified retirement plans. Its headquarters is at 100 N. Barranca St., Suite 400, West Covina, California 91791.

18.     Paredes and PFS were the Trustee of the Plan at the time of the ESOP Transaction. The Trustee had sole and exclusive discretion to authorize and negotiate the ESOP Transaction on behalf of the Plan and ESOT. PFS was at all relevant times Paredes's operating company. PFS acted in the ESOP Transaction through Paredes. Paredes and PFS are, and have held themselves out as, essentially one and the same with regard to the ESOP trustee services they provide. PFS provides a team of approximately fifteen full-time individuals to execute ESOP transactions including an in-house business appraiser, a routine due diligence process, office space, and insurance. Plan sponsors' retainers are payable to PFS for the ESOP trustee services Paredes and PFS provide.

19.     At the time of the ESOP Transaction, the Trustee was a fiduciary of the Plan within the meaning of ERISA § 3(21)(A), 29 U.S.C. § 1002(21)(A), because it was the trustee within the meaning of ERISA § 403(a), 29 U.S.C. § 1103(a), and because it exercised discretionary authority or discretionary control respecting management of the Plan, and/or exercised authority or control respecting management or disposition of the Plan's assets, and/or had discretionary authority or discretionary responsibility in the administration of the Plan. As Plan trustee, the Trustee was a Named Fiduciary, within the meaning of ERISA § 402(a), 29 U.S.C. § 1102(a), under Section 14.1 of the Plan Document.

20.     Defendant Christopher J. Debbas is a co-founder of ACCT and is and was at the time of the ESOP Transaction Chairman of the Board of Directors at ACCT and Chairman of the

Board of Managers at its subsidiary Advanced Call Center Technologies, LLC. He is a co-founder and the Senior Partner of Julip Run Capital and was Managing Partner at Julip Run Capital's predecessor, CD Ventures. He was a selling shareholder in the ESOP Transaction, directly or indirectly. He resides or may be found in this District, as ACCT is headquartered in Berwyn, Pennsylvania and he resides in Devon, Pennsylvania.

21.     Debbas was a party in interest under ERISA § 3(14), 29 U.S.C. § 1002(14), at the time of the ESOP Transaction as a director of ACCT, whose eligible employees were covered by the Plan; an individual having powers or responsibilities similar to those of a director of Advanced Call Center Technologies, LLC, whose eligible employees were covered by the Plan; a Plan fiduciary; and, on information and belief, a 10 percent or more shareholder of ACCT, directly or indirectly.

22.     Debbas, as a director of ACCT, had at all relevant times fiduciary power to appoint and remove other Plan fiduciaries, including the Plan's trustee and the person or persons appointed to supervise the administration of the Plan, and was a fiduciary as director of the Plan Administrator and Named Fiduciary, ACCT. Debbas signed the ESOT Trust Agreement appointing the ESOT trustee on behalf of ACCT. At the time of the ESOP Transaction, Debbas was a fiduciary of the Plan within the meaning of ERISA § 3(21)(A) because he exercised discretionary authority or discretionary control respecting management of the Plan, and/or exercised authority or control respecting management or disposition of the Plan's assets, and/or had discretionary authority or discretionary responsibility in the administration of the Plan.

23.     Defendant James R. Griffiths is a co-founder of ACCT and is and was at the time of the ESOP Transaction a director of ACCT and the Vice President, Chief Financial Officer (CFO), and Treasurer of ACCT and Advanced Call Center Technologies, LLC. He is a co-

founder and the Managing Partner of Julip Run Capital and was a Partner at Julip Run Capital's predecessor, CD Ventures. He has passed all parts of the uniform CPA examination in the State of Tennessee. He was a selling shareholder in the ESOP Transaction, directly or indirectly. He resides or may be found in this District, as ACCT is headquartered in Berwyn, Pennsylvania and, on information and belief, he resides in Chester County, Pennsylvania.

24.     Griffiths was a party in interest under ERISA § 3(14), 29 U.S.C. § 1002(14), at the time of the ESOP Transaction as a director and officer of ACCT, whose eligible employees were covered by the Plan; an officer of Advanced Call Center Technologies, LLC, whose eligible employees were covered by the Plan; an individual having powers or responsibilities similar to those of a director of Advanced Call Center Technologies, LLC; a Plan fiduciary; and, on information and belief, a 10 percent or more shareholder of ACCT, directly or indirectly.

25.     Griffiths, as a director of ACCT, had at all relevant times fiduciary power to appoint and remove other Plan fiduciaries, including the Plan's trustee and the person or persons appointed to supervise the administration of the Plan, and was a fiduciary as director of the Plan Administrator and Named Fiduciary, ACCT. He signed the Plan's 2021–2023 Forms 5500, under penalties of perjury, as Plan Administrator. At the time of the ESOP Transaction, Griffiths was a fiduciary of the Plan within the meaning of ERISA § 3(21)(A) because he exercised discretionary authority or discretionary control respecting management of the Plan, and/or exercised authority or control respecting management or disposition of the Plan's assets, and/or had discretionary authority or discretionary responsibility in the administration of the Plan.

26.     Defendants John and Jane Does 1–20 are Selling Shareholders who sold the Plan ACCT stock in the ESOP Transaction, directly or indirectly, whose identities are unknown to Plaintiff. They include parties in interest to the Plan. Julip Run Capital explains that when it

forms a new limited liability company (like ACCT), it "issue[s] all of the common units of the new LLC to the founders (CEO, relevant management team members, and Julip Run Capital)." On information and belief, John and Jane Does 1–20 include Julip Run Capital and/or related entities; officers and employees of ACCT and/or Advanced Call Center Technologies, LLC; and other persons who invested in ACCT through a fund or entity related to Julip Run Capital, and they knowingly participated, directly or indirectly, in the ERISA-prohibited stock transaction. Discovery is needed to identify John and Jane Does 1–20. Once their identities are ascertained, Plaintiff will substitute their names.

## **FACTUAL ALLEGATIONS**

27.     ACCT Holdings, Inc. ("ACCT," formerly ACCT Holdings, LLC) is a Berwyn, Pennsylvania-based holding company that, through its subsidiaries, provides contact centers and back-office support services, including as a debt collection agency, from offices in Arizona, California, Louisiana, Oklahoma, Pennsylvania, Tennessee, Texas, Utah, Guatemala, Jamaica, the Philippines, and South Africa. ACCT does business as Advanced Call Center Technologies and ACT. ACCT was formed by private equity firm Julip Run Capital's predecessor CD Ventures through the acquisition of Atlanta-based Advanced Call Center Technologies, LLC, which is and was in the debt collection business. ACCT was formed in Delaware on March 17, 2003. ACCT was converted from a limited liability company to a corporation on or about June 30, 2018. Advanced Call Center Technologies, LLC, a subsidiary of ACCT, was formed in Georgia on December 17, 1996.

28.     Julip Run Capital is a private equity firm formed in Delaware on April 23, 2009. CD Ventures, predecessor company to Julip Run Capital, was formed in Delaware as a corporation on May 8, 1996, and as a limited liability company on October 27, 1998. Julip Run

Capital and CD Ventures have and had numerous affiliates and subsidiaries, such as CD Venture

Partners VII, L.P.; CDV Equity Associates, LP; CD Venture Fund Inc.; CDV Capital Partners,

L.P.; CD Capital GP, LLC; CD Capital Management GP, LLC; Advanced Call Center

Technologies of Guatemala, LLC; Advanced Call Center Technologies of Jamaica, LLC; and

Advanced Call Center Technologies of South Africa, LLC. Julip Run Capital is headquartered at

1235 Westlakes Drive, Suite 160, Berwyn, Pennsylvania 19312.

29.     ACCT is headquartered at 1235 Westlakes Drive, Suite 160, Berwyn,

Pennsylvania 19312. ACCT's headquarters is co-located at the offices of Julip Run Capital.

30.     ACCT adopted the Plan with a retroactive effective date of January 1, 2021.

31.     Qualifying employees of ACCT and Advanced Call Center Technologies, LLC

are covered by the Plan.

32.     The Plan is a pension plan within the meaning of ERISA § 3(2), 29 U.S.C.

§ 1002(2), and is subject to ERISA pursuant to ERISA § 4(a)(1), 29 U.S.C. § 1003(a)(1).

33.     The Plan is intended to be an employee stock ownership plan (ESOP) within the

meaning of Internal Revenue Code Section 4975(e)(7) and Section 407(d)(6) of ERISA,

29 U.S.C. § 1107(d)(6). The Plan was designed to invest primarily in the employer securities of

ACCT. The Plan's principal asset was ACCT stock at all times since the ESOP Transaction.

ACCT stock is not and never was readily tradeable on an established securities market.

34.     The Plan is an individual account plan, or defined contribution plan, under which

a separate individual account is maintained for each participant.

35.     The Plan's participants are or were employees of ACCT, Advanced Call Center

Technologies, LLC, and any other participating affiliated company that adopted the Plan and

Trust. The Plan covers substantially all United States employees of ACCT and Advanced Call Center Technologies, LLC.

36.     Individuals that were employed on January 1, 2021, were entered into the Plan on January 1, 2021. Employees hired after January 1, 2021, were and are entered into the Plan on the January 1 immediately preceding the date in which the employee reaches age 18 and has completed 1,000 hours of service during their first year of employment or during a subsequent Plan year. However, employees whose employment is governed under a collective bargaining agreement (unless the collectively bargaining agreement specifically requires their participation), leased employees, and employees who are nonresident aliens who do not receive from the Company any earned income or wages sourced from within the United States are not eligible to participate.

37.     In order to receive an allocation of ACCT's annual contribution to the Plan, a participant must be employed on the last day of the Plan year and have worked at least 1,000 hours of service during the Plan year. A participant need not be employed on the last day of the Plan year or have 1,000 hours of service during the Plan year to receive an allocation of ACCT's contribution if he or she dies, retires after reaching age 65, or becomes disabled during the Plan year.

38.     ACCT employees eligible to participate in the Plan do not have a choice whether to participate in the Plan as part of their compensation package or to choose other compensation for their labor. Participation in the Plan is automatic and employees cannot opt out of participation.

39.     Plaintiff was "automatically" enrolled in the Plan under Section 3.1(a) of the Plan Document, without her election or assent.

40.    Because she worked sufficient hours of service, Plaintiff was allocated ACCT stock to her Plan account during her employment, in which she was vested under the Plan's terms.

41.    Employee benefits, including employer contributions to an ESOP, are not a mere gratuity, but a form of deferred compensation. *See Chao v. Hall Holding Co., Inc.*, 285 F.3d 415, 443-44 (6th Cir. 2002); *Brundle v. Wilmington Tr., N.A.*, 919 F.3d 763, 769 n.1 (4th Cir. 2019). The Seventh Circuit has emphasized: "there are no free lunches; any [ESOP] benefit that an employer confers on an employee is reckoned by the employer as a cost and so affects the overall level of compensation that he is willing to pay." *Steinman v. Hicks*, 352 F.3d 1101, 1103 (7th Cir. 2003).

42.    ACCT is and was from the inception of the Plan the sponsor of the Plan within the meaning of ERISA § 3(16)(B), 29 U.S.C. § 1002(16)(B).

43.    ACCT is and was from the inception of the Plan the administrator of the Plan within the meaning of ERISA § 3(16)(A), 29 U.S.C. § 1002(16)(A).

44.    The Plan's 2021, 2022, and 2023 Forms 5500 identify ACCT as the sponsor and administrator of the Plan.

45.    ACCT is and was an ERISA fiduciary to the Plan as the Plan Administrator. ACCT keeps the records for the Plan and is responsible for the administration of the Plan. ACCT has discretionary authority to construe the terms of the Plan and to make determinations on questions that may affect participants' eligibility for benefits.

46.    ACCT is and was an ERISA fiduciary to the Plan because it possesses under the Plan Document, and exercised, the fiduciary power to appoint and remove other Plan fiduciaries,

including the ESOT trustee and the person or persons appointed to supervise the administration of the Plan.

47.    ACCT is and was from the inception of the Plan a Named Fiduciary of the Plan, within the meaning of ERISA § 402(a), 29 U.S.C. § 1102(a), under Section 14.1 of the written Plan Document under which the Plan was established and maintained. ACCT is and was a Named Fiduciary under Section 14.1 as "the Company" and as the Plan Administrator.

48.    ACCT is and was at the time of the ESOP Transaction a party in interest to the Plan under ERISA § 3(14), 29 U.S.C. § 1002(14).

49.    Attached to the Plan's 2021–2023 Forms 5500, the supplemental schedule titled Schedule H, Line 4i Assets (Held at End of Year) states ACCT is a party-in-interest to the Plan.

50.    ACCT, by its Board of Directors, appointed Paredes as trustee of the Plan's ESOT prior to the ESOP Transaction at a time when Selling Shareholders owned and controlled the company. As trustee, the Trustee had sole and exclusive authority to negotiate and approve the ESOP Transaction on behalf of the Plan, including the price the Plan paid for ACCT stock. Debbas, Griffiths and other Selling Shareholders who served as or appointed directors, who were the seller-side in the ESOP Transaction, therefore appointed the buyer-side counter-party trustee in the Transaction. An unconflicted independent fiduciary did not make the appointment.

51.    The Trustee received fees from ACCT for its services as transaction trustee in the ESOP Transaction to the buyer-side Plan under a contract made under Selling Shareholders' ownership and control of ACCT. The Trustee also received fees after the ESOP Transaction because it was appointed ongoing trustee to the Plan to serve following the closing of the Transaction, which was intended to benefit Selling Shareholders, including private equity firm

Julip Run Capital (or its affiliates) and its principals, and other direct and indirect beneficiaries of the Plan's imprudent stock purchase.

52.     On December 20, 2021—two days before the ESOP Transaction—ACCT filed with the Secretary of State of Delaware the Amended and Restated Certificate of Incorporation of ACCT Holdings, Inc. (the "2021 Certificate of Incorporation"), reporting the Board of Directors adopted and the holders of the requisite number of shares approved an amendment and restatement of the Certificate of Incorporation. While the previous ACCT Certificate of Incorporation allowed the issuance of One Million (1,000,000) shares of common stock, consisting of Nine Hundred Thousand (900,000) shares of voting common stock and One Hundred Thousand (100,000) shares of non-voting common stock, the 2021 Certificate of Incorporation authorized ACCT to issue Twenty Million (20,000,000) shares of common stock. Griffiths executed the 2021 Certificate of Incorporation.

53.     On December 22, 2021, the Plan, through its ESOT, purchased from Selling Shareholders, directly or indirectly, 17,386,919 shares of ACCT common stock for $320,000,000.

54.     The Plan's purchase of the ACCT shares was financed by cash paid by the ESOT to Selling Shareholders in the amount of $118,500,000, financed by a loan received from ACCT in the same amount (the "Initial ESOP Company Loan") and note payables issued by the ESOT to Selling Shareholders aggregating $201,500,000 (the "Seller Notes"). ACCT, the ESOT and Selling Shareholders entered into an assignment agreement on December 22, 2021, whereby ACCT assumed the ESOT's obligations under the Seller Notes and the ESOT issued to ACCT a note payable in the amount of $201,500,000 (the "Second ESOP Company Loan") and ACCT and the ESOT agreed to consolidate the Initial ESOP Company Loan and the Second ESOP

Company Note into one loan in the amount of $320,000,000 (the "ESOP Loan"), maturing on December 31, 2070, with interest at 1.90 percent.

55.     As a result of the ESOP Transaction, the Plan and the participants who participated in it became owners of all of the issued and outstanding shares of ACCT common stock.

56.     At the time of the ESOP Transaction and thereafter, Defendants Debbas and Griffiths were directors or director-equivalents of ACCT and Advanced Call Center Technologies, LLC, and Griffiths was a principal officer, and they have maintained firm control over the companies since the Transaction.

57.     All of the ACCT directors since the ESOP Transaction were ACCT directors and/or officers prior to and/or at the time of the Transaction. The ACCT directors from 2018 to 2021, when the ESOP Transaction occurred, included Debbas, Griffiths, Gregory S. Campbell, Joseph Lembo, and Russell L. Hughes, Jr. The ACCT directors in 2023 were Debbas, Griffiths, and Hunter Croft. Hunter Croft has been an officer of ACCT and Advanced Call Center Technologies, LLC since 2003 and is their Chief Executive Officer (CEO) and President.

58.     Debbas and Griffiths, and other Selling Shareholders such as Julip Run Capital or its affiliate, retained control of the ACCT Board after the ESOP Transaction as a result of their positions as directors and officers; through employees, appointees, and/or proxies holding positions as directors and officers; due to the millions of dollars of Company and ESOT debt they held from the ESOP Transaction including but not limited to rights arising from warrants or other synthetic equity issued to them; through Julip Run Capital's continued control over ACCT, whose headquarters was and remains co-located at the headquarters of Julip Run Capital;

through various transaction documents, including the stock purchase agreement and warrants; and through a compliant trustee that could be fired by ACCT's Board of Directors.

59.    Debbas and Griffiths, and other Selling Shareholders, were centrally involved in conceiving of, facilitating, and executing the Transaction, including conducting a selection process for ownership transition from the private equity firm and investors to an ESOP rather than to another buyer; hiring Transaction advisors for ACCT and Selling Shareholders such as Julip Run Capital or its related entity; hiring a compliant Trustee to nominally represent the counter-party Plan; giving the approval of Julip Run Capital or its related entity or general partner, and obtaining any needed consent by other investors; adopting the restatement of the new 2021 Certificate of Incorporation to rearrange ACCT shareholder interests prior to the Transaction; directing the preparation of and preparing financial projections by CFO Griffiths and his staff for use in valuations in the Transaction; and approving ACCT's lending of $320 million in the fully leveraged transaction.

60.    The Trustee valued the ACCT stock on a control basis by using an industry capital structure instead of the Company's actual capital structure in its income method, which yielded a control value. But the Plan did not obtain control of the Company, as explained above, because Debbas, Griffiths and other Selling Shareholders maintained control over the Board and, through the Board, ACCT. The Plan should have received a discount for lack of control, but it did not. This means the Plan paid more than fair market value for the stock.

61.    The Trustee's appraisal of ACCT stock in the ESOP Transaction was based upon a combination of income and market valuation techniques. ACCT management provided data from historical and projected financial information of the Company to the Trustee for the valuation of ACCT stock in the ESOP Transaction. Forecasts prepared by ACCT management,

including CFO James R. Griffiths, were used in the valuation methodology employed by the Trustee and its financial advisor. The projections were unreasonably optimistic. The appraisal used as comparables companies that differed from ACCT, including smaller public companies with prospects differing from ACCT, whose stock was sold to the Plan for the excessive amount of $320,000,000, and/or companies serving different markets, based in different geographic locations, companies that became part of much larger public firms and benefited due to economies of scale unlike this independent firm, and/or, unlike here, companies purchased by strategic buyers paying an inflated price due to perceived synergies.

62.    The Trustee did not adequately challenge information provided by ACCT management or the valuation techniques of its financial advisor and therefore failed to negotiate for the true, lower fair market value price of ACCT stock as of the date of the ESOP Transaction.

63.    The Trustee failed to apply a sufficient discount for lack of marketability (DLOM) to its valuation in the ESOP Transaction because it failed to sufficiently account for the lack of marketability for the stock that was purchased by the ESOT. The valuation applied an insufficient DLOM because Plan participants, beneficial owners rather than legal owners, have a right to have the Company or the Trustee buy any shares of ACCT stock distributed to participants that is not publicly traded (the Put Option). But the ESOT was the purchaser in the ESOP Transaction and participants' sales to the Company or ESOT do not reduce the lack of marketability to the ESOT of the stock the ESOT owns. In addition, the Plan's lack of control over ACCT made it lack marketability. The Plan overpaid for ACCT stock in the Transaction due to the Trustee's improper application of DLOM, in the range of 5% to 25% for the inadequate DLOM alone.

64.    The Plan permits "synthetic equity," which means: "(i) any stock option, warrant, restricted stock, deferred insurance stock right, stock appreciation right payable in stock, or similar interest or right that gives the holder the right to acquire or receive stock of the S Corporation in the future; (ii) a right to a future payment (payable in cash or any other form other than stock of the S corporation) from an S corporation that is based on the value of the stock of the S corporation, such as stock appreciation right that is payable in cash or, phantom stock unit with respect to stock of an S corporation that is payable in cash; and (iii) to the extent provided in Treas. Reg. Section 1.409(p)-1(f)(4)(iii) or subsequent guidance, other forms of nonqualified deferred compensation." ACCT is an S corporation.

65.    Synthetic equity is usually granted to high level executives by the board of directors. Here, Defendants Debbas and Griffiths, and other Selling Shareholders, were on the Board and/or high level officers in the relevant period.

66.    When synthetic equity is granted, it dilutes the value of company shares held by ESOP participants and transfers that value to those persons holding the synthetic equity. Thus when synthetic equity is granted, it reduces the value of the ACCT shares owned by the Plan. This either harms the economic interest of Plan participants or, if the synthetic equity is not properly taken into account in the valuation of ACCT stock, the stock is reported at inflated values.

67.    A rational buyer under no compulsion to purchase ACCT under terms like these (*i.e.*, a Board controlled by Debbas and Griffiths, and their cohorts, who could dilute the value of all ACCT stock by granting themselves synthetic equity) would not have purchased the company stock that the ESOP was forced to purchase, or would have demanded a massive discount in the price of the stock to account for these defects of ownership.

68.     Warrants, a type of synthetic equity permitted under the Plan, may be issued to selling shareholders in or following an ESOP transaction. Warrants can allow selling shareholders to receive an amount over and above fair market value for their companies, which can be as much as 20 or 30 percent of the entire business, which over the course of a decade can be worth more than the entire business was worth on the day the selling shareholders sold it. The value of the warrant is manipulable because a warrant is the right to buy shares in the business at a price that is agreed-upon. Warrants thus may give selling shareholders who take debt for the sale of their companies in ESOP transactions compensation above and beyond the amount of the interest rate on the loan paid by an ESOP.

69.     With regard to the ESOP transactions he has engaged in as a trustee, Paredes has stated that "the overall majority of those have a warrant component." Likewise, he said stock appreciation rights (SARs) are "almost identical to a warrant," he views them "in a very positive light" and "they're great tools," and they are "very commonplace when we're implementing an ESOP."

70.     The Plan overpaid for ACCT, and Selling Shareholders received improper profits, as a result of warrants issued to them. A rational buyer under no compulsion to purchase ACCT would not have agreed to the warrants upon its purchase of ACCT stock.

71.     In breach of their duty of loyalty to plans and their participants and beneficiaries, ESOP trustees have defined and employed deficient "industry" standards for themselves alone that deviate from sound business practices employed by non-ESOP buyers in the so-called "real world" and required by ERISA. In accordance with its and "industry" routine practices, the Trustee's due diligence in the ESOP Transaction was less extensive and thorough than the due diligence performed by third-party buyers in corporate transactions of similar size and

complexity. Incentives to the Trustee to fail to exercise care, skill, prudence and diligence in the interest of Plan participants and beneficiaries in the ESOP Transaction by failing to apply sound business principles of evaluation and to conduct a prudent investigation and negotiation included the possibility of business from sellers of companies who understood that the Trustee applied a lesser degree of due diligence in ESOP purchases of businesses than is typical for non-ESOP-buyers' purchases of businesses, that the Trustee intended to consummate ESOP transactions and benefit the sellers driving them with transfers of plan assets for stock based upon a methodology deviating from sound business practices, referrals for such work by other service providers in the ESOP creation and administration business, and engagement as the Plan's ongoing trustee after the ESOP Transaction and the fees paid for that engagement.

72.    The Trustee was rewarded with engagement as the Plan's ongoing trustee by Selling Shareholders including Debbas and Griffiths, who still controlled ACCT, upon completing the ESOP Transaction to their satisfaction.

73.    As trustee for the Plan, it was the Trustee's duty to ensure that any transactions between the Plan and Selling Shareholders and between the Plan and ACCT, including acquisitions of ACCT stock by the Plan and loans to the Plan, were fair and reasonable and to ensure that the Plan paid no more than fair market value.

74.    Under the ESOT's Trust Agreement, effective as of January 1, 2021, purchases of company stock entered into by the ESOT under the authority of the Trustee "shall be made at fair market value as determined in good faith by the Trustee" and "in accordance with any applicable requirements of [ERISA], as amended." (Trust Agreement § 2.1(b)).

75.    The Trust Agreement is part of the Plan, with the Plan Document.

76.    The Plan Document, effective as of January 1, 2021, provides at Section 5.2 that "[t]he value of any Company Stock held in the Trust Fund not readily tradable on an established securities market shall be its fair market value per share." The Plan Document further provides: "Any fiduciary with respect to the Plan shall discharge his or her duties solely in the interests of Participants and Beneficiaries for the exclusive purpose of providing benefits to Participants and Beneficiaries and defraying reasonable expenses of the Plan. In addition, any fiduciary with respect to the Plan shall discharge his or her duties with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent person acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of like character and with like aims." (Plan § 14.3).

77.    The Trustee did not conduct a good faith investigation into the value of ACCT stock, the Plan paid more than fair market value for the stock, and the Trustee violated the Plan's governing instruments and materially and substantially departed from the standards of care required by ERISA and the sound business principles of evaluation prevailing in stock purchase transactions of this size, $320 million. The Trustee did not meet its duties of loyalty or "exclusive purpose" and duties of care, skill, prudence, and diligence, under the Plan's governing documents and ERISA.

78.    The Plan suffered losses due to the overvaluation of ACCT stock in the ESOP Transaction and its overpayment for the stock, in an amount to be determined following discovery and expert analysis of non-public information concerning the Trustee's and its financial advisor's valuation and due diligence methodologies, ACCT financials and growth projections, and other documents and information that were considered or should have been considered in the ESOP Transaction.

79.     Due to the Plan's overpayment, the Plan's participants, whose losses are coterminous with the Plan's, received diminished stock allocations, saw their Plan take on excessive debt to finance the Transaction, and suffered losses to their individual Plan accounts.

80.     The Trustee is liable to the Plan for the difference between the price paid by the Plan and the fair market value of ACCT shares at the time of the ESOP Transaction.

81.     Selling Shareholders—including Debbas, Griffiths, and John and Jane Does 1–20—are liable to the Plan to repay the difference between the price they received and the fair market value of their ACCT shares at the time of the ESOP Transaction.

## CLAIMS FOR RELIEF

## COUNT I

**Declaratory Judgment Under 28 U.S.C. §§ 2201–2202 of Invalidity of the Plan's Arbitration Provision for Want of an Agreement to Arbitrate, Against All Defendants**

82.     Plaintiff incorporates the preceding paragraphs as though set forth herein.

83.     In or about July 2024—months after Plaintiff left employment at ACCT and ceased accruing Plan benefits and wages on November 29, 2023—ACCT's Board of Directors unilaterally approved the First Amendment to ACCT Holdings, Inc. Employee Stock Ownership Plan (the "First Amendment"), which for the first time placed an arbitration procedure into the Plan Document at Section 16.4 (the "Arbitration Provision"), stated to be retroactively effective as of January 1, 2024.

84.     The Arbitration Provision was adopted by ACCT on approval of Defendant Debbas, Defendant Griffiths, and Hunter Croft, the members of ACCT's Board of Directors. When unilaterally inserting the Arbitration Provision into the Plan Document by amendment, Debbas, Griffiths, and Croft had no counterparty with whom to negotiate or to seek assent.

ACCT imposed the Arbitration Provision unilaterally and neither Plaintiff nor the Plan she represents was a counterparty assenting to any aspect of Section 16.4.

85.    Section 16.4(s) of the Arbitration Provision provides: "<u>Enforcement</u>. This Arbitration provision and the arbitration award are enforceable and subject to federal law and the Federal Arbitration Act, 9 U.S.C. § 1, et seq."

86.    The "first principle" of the Supreme Court's Federal Arbitration Act ("FAA") jurisprudence is that arbitration is strictly a matter of consent; a party can be forced to arbitrate only those issues she specifically has agreed to submit to arbitration. *Viking River Cruises, Inc. v. Moriana*, 596 U.S. 639, 651, 659–60 (2022).

87.    Section 16.3 of the Plan provides, in relevant part: "<u>Governing Law</u>. Except to the extent superseded by ERISA, all questions pertaining to the validity, construction, and operation of the Plan shall be determined in accordance with the laws of the Commonwealth of Pennsylvania." Plan § 16.3.

88.    Section 15.1 of the Plan provides, in relevant part: "As future conditions cannot be foreseen, the Board of Directors of the Company reserves the right to amend or terminate this Plan and the Trust Agreement, in whole or in part, at any time, by the sole action of the Board of Directors."

89.    Plaintiff did not consent to or receive consideration for any part of the Arbitration Provision.

90.    The Arbitration Provision was unilaterally adopted by Defendant Debbas, Defendant Griffiths, and Hunter Croft, and they may further unilaterally alter and revoke all or part of Section 16.4 without the assent of any counterparty, including Plaintiff. Section 16.4 is thus entirely optional, illusory, and lacks consideration.

91.     The Arbitration Provision (as a whole or any part of it) is not an "agreement" within the meaning of Sections 2 through 4 of the FAA, 9 U.S.C. §§ 2–4.

92.     Section 16.5 of the First Amendment provides in relevant part: "<u>Restriction on Venue</u>. For individual claims for employee benefits pursuant to ERISA § 502(a)(1)(B), 29 U.S.C. § 1132(a)(1)(B), and to the extent any Claimant fails or refuses to comply with the Arbitration provision, or *wishes to challenge the legal enforceability of the Arbitration provision*, or to the extent the Arbitration provision is invalidated, *such action or challenge shall be filed exclusively in the United States District Court for the Eastern District of Pennsylvania*, which is where the Plan is administered, or a court in which appeals from that Court may be heard." First Amend. § 16.5 (emphasis added).

93.     Moreover, under the FAA and Supreme Court authority, the court, and not an arbitrator, determines whether a valid arbitration agreement exists. *See, e.g.*, *Coinbase, Inc. v. Suski*, 602 U.S. 143, 151 (2024); 9 U.S.C. §§ 2–4.

94.     An actual and justiciable controversy exists between Defendants and Plaintiff concerning the validity and enforceability of Section 16.4. Accordingly, as alleged herein, a real and substantial, and immediate controversy is presented regarding the rights, duties and liabilities of the parties. A judicial declaration that Section 16.4 is unenforceable against Plaintiff's claims will resolve part of the present controversy and provide conclusive relief.

95.     Plaintiff therefore seeks a declaratory judgment pursuant to the Federal Declaratory Judgment Act, 28 U.S.C. §§ 2201–2202, declaring that Section 16.4 is invalid and unenforceable as against Plaintiff; that Defendants are barred from enforcing Section 16.4 against Plaintiff's claims; and that Plaintiff's claims are properly filed and may be adjudicated in this Court.

## COUNT II

**Declaratory Judgment Under 28 U.S.C. §§ 2201–2202 of Invalidity of the Plan's Arbitration Provision Pursuant to the Prospective Waiver Doctrine and the Plan's Non-Severability and No Change Provisions, Against All Defendants**

96.     Plaintiff incorporates the preceding paragraphs as though set forth herein.

97.     Section 16.4(s) of the Arbitration Provision provides: "Enforcement. This

Arbitration provision and the arbitration award are enforceable and subject to federal law and the

Federal Arbitration Act, 9 U.S.C. § 1, et seq." ERISA is a federal law.

98.     Section 16.3 of the Plan further provides, in relevant part: "Governing Law.

*Except to the extent superseded by ERISA*, all questions pertaining to the validity, construction,

and operation of the Plan shall be determined in accordance with the laws of the Commonwealth

of Pennsylvania." Plan § 16.3 (emphasis added).

99.     Section 16.4(l) of the Arbitration Provision provides:

> Monetary Relief Limitation. The Arbitrator may award any party to the
> arbitration any remedy to which that party is entitled under applicable law, but
> such remedies shall be limited to those that would be available to a party in
> their individual capacity in a court of law for the claims presented to and
> decided by the Arbitrator, and no remedies that otherwise would be available
> to an individual in a court of law will be forfeited by virtue of this Arbitration
> provision; *provided, however, that a Claimant may not, in arbitration, seek or
> obtain an award of benefits or other monetary relief to any individual Plan
> Account other than the Claimant's own Account or the Account to which they
> are a Beneficiary ("monetary relief limitation"). For avoidance of doubt,
> claims for equitable relief that would have the effect of requiring the payment
> of additional money to Participants or Beneficiaries or their Accounts, or to
> the Plan, shall be subject to the same individualized relief limitation. If this
> monetary relief limitation is found to be unenforceable by any court of
> competent jurisdiction* or by the Arbitrator, then any claim that seeks an award
> of benefits or other monetary relief to any individual Plan Account other than
> the Claimant's own Account or the Account to which they are a Beneficiary
> *shall be filed and adjudicated in the United States District Court for the
> Eastern District of Pennsylvania or a court in which appeals from that Court
> may be heard, and not in arbitration.* In such a case, any related claim for
> equitable, injunctive, or non-monetary relief shall not remain in arbitration;
> rather, it shall be filed and adjudicated in the United States District Court for

the Eastern District of Pennsylvania or a court in which appeals from that
Court may be heard in the same proceeding as the claim for monetary relief.

First Amend. § 16.4(l) (emphasis added).

100.    Section 16.4(l) prohibits statutory relief to the Plan as a whole mandated under
ERISA §§ 409(a), 502(a)(2), and 502(a)(3), 29 U.S.C. §§ 1109(a), 1132(a)(2) and 1132(a)(3);
operates as a prospective waiver of Plaintiff's right to pursue statutory remedies; prevents
effective vindication of statutory rights and remedies; and is an unlawful exculpatory provision
under ERISA § 410(a), 29 U.S.C. § 1110(a).

101.    Section 16.4(r) of the Arbitration Provision provides that Section 16.4(l) is not
severable from the Arbitration Provision where Section 16.4(l) is "held by any court of
competent jurisdiction . . . to be invalid or unenforceable," and in such case "the remaining parts
or provisions" of the Arbitration Provision shall not continue to be effective.

102.    Section 16.4(k) of the Arbitration Provision provides that: "In no circumstances
. . . shall any change be made to . . . Section 16.4(l)" "[i]f any feature of this Arbitration
provision is impermissible under ERISA."

103.    Section 16.5 of the First Amendment provides in relevant part: "<u>Restriction on
Venue</u>. For individual claims for employee benefits pursuant to ERISA § 502(a)(1)(B),
29 U.S.C. § 1132(a)(1)(B), and to the extent any Claimant fails or refuses to comply with the
Arbitration provision, or *wishes to challenge the legal enforceability of the Arbitration provision*,
*or to the extent the Arbitration provision is invalidated, such action* or challenge *shall be filed
exclusively* in the United States District Court for the Eastern District of Pennsylvania, which is
where the Plan is administered, or a court in which appeals from that Court may be heard." First
Amend. § 16.5 (emphasis added).

104.    The U.S. District Court for the Eastern District of Pennsylvania and the U.S. Court of Appeals for the Third Circuit are courts of competent jurisdiction under Sections 16.4(l) and 16.5.

105.    The Third Circuit has twice found the relief limitation provided by Section 16.4(l) to be unenforceable and invalid. *See Henry on behalf of BSC Ventures Holdings, Inc. Emp. Stock Ownership Plan v. Wilmington Tr. NA*, 72 F.4th 499, 503, 506–508 (3d Cir. 2023) (arbitration provision was unenforceable because it prohibited plan-wide remedies, including monetary relief to non-party plan participants), *cert. denied*, No. 23-122, 2023 WL 6797729 (U.S. Oct. 16, 2023); *Burnett v. Prudent Fiduciary Servs. LLC*, No. 23-1527, 2023 WL 6374192 (3d Cir. Aug. 15, 2023), *summarily affirming* No. 22-270, 2023 WL 2401707 (D. Del. March 8, 2023), *adopting in full report and recommendation of* No. 22-270, 2023 WL 387586, at *1–2, *5–6, *8 (D. Del. Jan. 25, 2023) (arbitration provision unenforceable and invalid because it prohibited plan-wide monetary relief). Third Circuit law is governing in this Court.

106.    Counts III and IV each seek monetary relief from the Trustee to the Plan as a whole pursuant to ERISA §§ 409(a) and 502(a)(2). Count V, a "derivative" claim to the stock purchase claims under § 406(a)(1)(A), (D) and § 502(a)(2) in Count III, seeks monetary equitable relief in the form of disgorgement or restitution of improper profits from Selling Shareholders to the Plan as a whole pursuant to ERISA § 502(a)(3). The § 409(a) relief of "any losses to the plan" sought in this lawsuit under § 502(a)(2) and the § 502(a)(3) equitable relief would benefit not only Plaintiff's Plan account but the Plan accounts of other participants and beneficiaries, and the Plan itself, because the alleged injury to the Plan did not injure only Plaintiff's Plan account but also the accounts of other participants who were vested in ACCT stock purchased by the Plan in the ESOP Transaction.

107.     Section 16.4(l)'s relief limitation is invalid, unenforceable, and impermissible for purporting to alter and abridge participant rights and remedies under ERISA, 29 U.S.C. §§ 1109(a), 1132(a)(2), and 1132(a)(3), in violation of the prospective waiver doctrine (*aka* the effective vindication doctrine or exception). The Arbitration Provision as a whole is therefore ineffective under Sections 16.4(r) and 16.4(k), which provide Section 16.4(l) is not severable and cannot be changed.

108.     Sections 16.4(l) and 16.5 require that Plaintiff's claims be "filed and adjudicated" in this Court "and not in arbitration" as the relief limitation is "unenforceable" and the Arbitration Provision is "invalidated" by the Third Circuit's findings in *Henry on behalf of BSC Ventures Holdings, Inc. Emp. Stock Ownership Plan v. Wilmington Tr. NA*, 72 F.4th 499, 503, 506–508 (3d Cir. 2023), *cert. denied*, No. 23-122, 2023 WL 6797729 (U.S. Oct. 16, 2023). *See also Burnett*, 2023 WL 387586, at *1–2, *5–6, *8.

109.     Section 16.4(j) of the Arbitration Provision provides that a claimant may bring "any dispute in arbitration on an individual basis only" and disputes regarding the validity and enforceability of Section 16.4(j) may be resolved only by the United States District Court for the Eastern District of Pennsylvania or a court in which appeals from that Court may be heard, and not by an arbitrator. In Counts III–V, Plaintiff does not seek relief "on an individual basis only" to herself for losses and restitution only to her individual account in the Plan, but rather seeks remedies on behalf of the Plan, including monetary relief to the Plan as a whole. Under Sections 16.4(k) and 16.4(r), Section 16.4(j) cannot be severed or changed.

110.     An actual and justiciable controversy exists between Defendants and Plaintiff concerning the validity of Section 16.4(l) and Section 16.4(j). Accordingly, as alleged herein, a real and substantial, and immediate controversy is presented regarding the rights, duties and

liabilities of the parties. A judicial declaration that Section 16.4(l) and/or Section 16.4(j) is unenforceable against Plaintiff's claims will resolve part of the present controversy and provide conclusive relief.

111.   Plaintiff therefore seeks a declaratory judgment pursuant to the Federal Declaratory Judgment Act, 28 U.S.C. §§ 2201–2202, declaring that the relief limitation at Section 16.4(l) is invalid, unenforceable, and impermissible; that the limitation at Section 16.4(j) is invalid, unenforceable, and impermissible; that the Arbitration Provision is ineffective as both 16.4(l) and 16.4(j) are non-severable and non-changeable; that Plaintiff may seek in Counts III–V relief on behalf of the Plan, including monetary relief and restitution to the Plan as a whole, and is not limited to relief to herself on an individual, non-representative basis; that Defendants are barred from enforcing the Arbitration Provision against Plaintiff's claims; and that Plaintiff's claims are properly filed and may be adjudicated in this Court.

### COUNT III

**Causing Prohibited Transactions Forbidden by ERISA § 406(a), 29 U.S.C. § 1106(a), Against Miguel Paredes and PFS**

112.   Plaintiff incorporates the preceding paragraphs as though set forth herein.

113.   ERISA § 406(a)(1)(A), 29 U.S.C. § 1106(a)(1)(A), prohibits a plan fiduciary, here the Trustee, Defendants Miguel Paredes and PFS, from causing a plan, here the Plan, to engage in a sale or exchange of any property, here ACCT stock, with a party in interest, here Selling Shareholders, as took place in the ESOP Transaction.

114.   ERISA § 406(a)(1)(B), 29 U.S.C. § 1106(a)(1)(B), prohibits the Trustee from causing the Plan to borrow money from a party in interest, here Selling Shareholders and ACCT, as took place in the ESOP Transaction.

115.    ERISA § 406(a)(1)(D), 29 U.S.C. § 1106(a)(1)(D), prohibits the Trustee from causing the Plan to engage in a transaction that constitutes a direct or indirect transfer to a party in interest, here Selling Shareholders, of any assets of the Plan, as took place in the ESOP Transaction intended to benefit Selling Shareholders with the transfer of Plan assets to Selling Shareholders for their ACCT stock.

116.    The stock and loan transactions between the Plan and the parties in interest were authorized by the Trustee in its capacity as trustee for the Plan.

117.    The Trustee caused the Plan to engage in prohibited transactions in violation of ERISA § 406(a), 29 U.S.C. § 1106(a), in the ESOP Transaction.

118.    ERISA § 409, 29 U.S.C. § 1109, provides, *inter alia*, that any person who is a fiduciary with respect to a plan and who breaches any of the responsibilities, obligations, or duties imposed on fiduciaries by Title I of ERISA shall be personally liable to make good to the plan any losses to the plan resulting from each such breach, and to restore to the plan any profits of the fiduciary which have been made through the use of assets of the plan by the fiduciary, and additionally is subject to such other equitable or remedial relief as the court may deem appropriate, including removal of such fiduciary.

119.    ERISA § 502(a)(2), 29 U.S.C. § 1132(a)(2), permits a plan participant to bring a suit for relief to a plan under ERISA § 409.

120.    The Trustee has caused losses to the Plan by the prohibited transactions in an amount to be proved specifically at trial.

## COUNT IV

**Breaches of Fiduciary Duty Under ERISA § 404(a), 29 U.S.C. § 1104(a),
Against Miguel Paredes and PFS**

121.    Plaintiff incorporates the preceding paragraphs as though set forth herein.

122.    ERISA § 404(a)(1), 29 U.S.C. § 1104(a)(1), requires, *inter alia*, that a plan fiduciary discharge his or her or its duties with respect to a plan solely in the interest of the participants and beneficiaries, (A) for the exclusive purpose of providing benefits to participants and the beneficiaries of the plan and defraying reasonable expenses of administering the plan, (B) with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent person acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of a like character and with like aims, and (D) in accordance with the documents and instruments governing the plan insofar as such documents and instruments are consistent with ERISA.

123.    The fiduciary duty of loyalty entails a duty to avoid conflicts of interest and to resolve them promptly when they occur. A fiduciary must always administer a plan with an "eye single" to the interests of the participants and beneficiaries, regardless of the interests of the fiduciaries themselves or the plan sponsor.

124.    ERISA § 409, 29 U.S.C. § 1109, provides, *inter alia*, that any person who is a fiduciary with respect to a plan and who breaches any of the responsibilities, obligations, or duties imposed on fiduciaries by Title I of ERISA shall be personally liable to make good to the plan any losses to the plan resulting from each such breach, and to restore to the plan any profits of the fiduciary which have been made through the use of assets of the plan by the fiduciary, and additionally is subject to such other equitable or remedial relief as the court may deem appropriate, including removal of such fiduciary.

125.    ERISA § 502(a)(2), 29 U.S.C. § 1132(a)(2), permits a plan participant to bring a suit for relief to a plan under ERISA § 409.

126.    The Trustee was required to undertake an appropriate and independent investigation of the fair market value of ACCT stock in or about December 2021 in order to fulfill its fiduciary duties, and an appropriate investigation would have revealed that the valuation used for the ESOP Transaction did not reflect the fair market value of the ACCT stock purchased by the Plan.

127.    The Trustee was required to act independently on behalf of the Plan, to probe and question financials, projections, control features, and other information provided by ACCT management and the seller side, and it did not adequately do so.

128.    The Trustee was required to negotiate for the Plan to pay no more than fair market value for ACCT stock in the ESOP Transaction, and it failed to do so, but instead approved the imprudent Transaction.

129.    The Trustee breached its duties under ERISA § 404(a)(1), 29 U.S.C. § 1104(a)(1).

130.    The Trustee has caused losses to the Plan by its breaches of fiduciary duty in an amount to be proved specifically at trial.

## COUNT V

**Knowing Participation in ERISA Violations Pursuant to 29 U.S.C. § 1132(a)(3), Against Debbas, Griffiths, and John and Jane Does 1–20**

131.    Plaintiff incorporates the preceding paragraphs as though set forth herein.

132.    ERISA § 502(a)(3), 29 U.S.C. § 1132(a)(3), *inter alia*, permits a plan participant to bring a civil action to obtain appropriate equitable relief to redress violations of the provisions of Title I of ERISA, or to enforce the provisions of Title I of ERISA or the terms of a plan.

133.    The Supreme Court has held that anyone, including a non-fiduciary, who receives the benefit of conduct that violates ERISA may be subject to equitable remedies under ERISA § 502(a)(3) if they have "actual or constructive knowledge of the circumstances that rendered the

transaction unlawful." *Harris Trust & Sav. Bank v. Salomon Smith Barney, Inc.*, 530 U.S. 238, 251 (2000).

134.    As a result of the prohibited stock transaction described above, Selling Shareholders received Plan assets in payment above fair market value for their ACCT stock.

135.    Selling Shareholders included parties in interest to the Plan under ERISA § 3(14), 29 U.S.C. § 1002(14), as described above.

136.    Selling Shareholders knew or should have known (1) about the existence of the Plan, (2) about the Plan's purchase of their ACCT stock in the ESOP Transaction, (3) that the Trustee was the fiduciary trustee to the Plan, (4) that Selling Shareholders included ACCT directors, officers, employees, fiduciaries and/or 10% or more shareholders, and (5) that the Trustee caused the Plan's ESOT to engage in the stock transaction.

137.    As parties to and/or beneficiaries of the stock purchase agreement containing the terms of the Plan's stock purchase from Selling Shareholders and countersigned by the Trustee on behalf of the ESOT; as the sellers of $320 million in stock with an interest in having knowledge of and/or competently negotiating the Transaction; as officers and directors of ACCT, which participated in the loan component of the Transaction with their approval, and which was the sponsor, Named Fiduciary, and fiduciary administrator of the Plan; as Plan fiduciaries; as directors and officers of ACCT and Julip Run Capital, including the CFO (Griffiths) whose team provided company financial information and projections to the buyer side, and which made other disclosures in response to requests for information that showed the scope of the Trustee's inadequate due diligence, and that the Trustee caused the ESOT to pay above fair market value for ACCT stock; and as directors/officers/owners who knew the control features of the Company and Transaction that caused the Plan to overpay on a control basis or

due to want of a discount for lack of control and knew other facts that made management

projections unreasonably optimistic, Selling Shareholders were aware of sufficient facts that the

ESOP Transaction constituted a prohibited transaction; that the Plan paid more than fair market

value in the Transaction; and that the Trustee did not adequately investigate and value the stock.

138.    Further, it may be inferred that Selling Shareholders had "reasonable knowledge

of all relevant facts" because the fair market value standard is that fair market value is the price

at which the stock would change hands between a willing buyer and a willing seller, neither

being under any compulsion to buy or sell and *both having reasonable knowledge of all relevant*

*facts*. Selling Shareholders had knowledge of the relevant facts, and based upon them made

findings to approve and confirm ACCT to take part in the ESOP Transaction, and/or took part in

the Transaction themselves, directly or indirectly.

139.    Selling Shareholders are liable for knowingly participating in violations of ERISA

§ 406(a)(1)(A) and (D), 29 U.S.C. § 1106(a)(1)(A) and (D), alleged in Count III.

140.    Selling Shareholders have profited from the prohibited stock transaction in an

amount to be proven at trial, and upon information and belief, they remain in possession of assets

that belong to the Plan.

141.    Selling Shareholders are subject to appropriate equitable relief including

disgorgement or restitution of any ill-gotten gains they received in connection with the ESOP

Transaction, accounting for profits, having a constructive trust placed on any proceeds received

(or which are traceable thereto), reformation of the ESOP Transaction contracts to provide the

Plan pays no more than fair market value for ACCT stock as of the date of the Transaction and to

give the Plan powers or other consideration for which it paid but did not receive, having the

transaction rescinded, requiring all or part of the consideration to be restored to the Plan, or to be subject to other appropriate equitable relief.

## **CLASS ACTION ALLEGATIONS**

142.    Plaintiff brings this action[1] as a class action pursuant to Fed. R. Civ. P. 23(a) and (b), on behalf of the following class:

> All vested participants in the ACCT Holdings, Inc. Employee Stock Ownership Plan ("Plan") and the beneficiaries of such participants as of the date of the December 22, 2021 ESOP Transaction or any time thereafter. Excluded from the Class are the shareholders who sold their ACCT Holdings, Inc. ("ACCT") stock to the Plan, directly or indirectly, and their immediate families; the directors and officers of ACCT and their immediate families; and legal representatives, successors, and assigns of any such excluded persons.

143.    The Class is so numerous that joinder of all members is impracticable. Although the exact number and identities of Class members are unknown to Plaintiff at this time, the Plan's most recent Form 5500 filing reports that as of December 31, 2023, there were 6,393 participants in the Plan.

144.    Questions of law and fact common to the Class as a whole include, but are not limited to, the following:

      i.     Whether Defendants Paredes and PFS served as trustee in the Plan's acquisition of ACCT stock;

      ii.     Whether the Trustee was an ERISA fiduciary of the Plan;

---

[1] Should the Court hold Plaintiff's claims subject to arbitration, Plaintiff would not seek a class or collective arbitration on behalf of or joining other participants, but would bring only a single-agent, single-principal representative arbitration on behalf of the Plan for relief to the Plan as a whole under ERISA §§ 409(a), 502(a)(2), and 502(a)(3), including but not limited to recovery of "any losses to the plan" resulting from Defendants' breaches of ERISA and restitution or disgorgement to the Plan of improper profits.

    iii.    Whether the Trustee caused the Plan to engage in prohibited transactions under ERISA by permitting the Plan to purchase ACCT stock from, take loans from, and transfer assets of the Plan to, parties in interest;

    iv.    Whether the Trustee engaged in good faith valuations of the ACCT stock in connection with the ESOP Transaction;

    v.    Whether the Trustee caused the Plan to pay Selling Shareholders more than fair market value for ACCT stock;

    vi.    Whether the Trustee breached its fiduciary duty to undertake an appropriate and independent investigation of the fair market value of ACCT stock on or about December 22, 2021;

    vii.    Whether ACCT was a party in interest and gave a loan to the Plan;

    viii.    Whether Selling Shareholders were parties in interest;

    ix.    Whether Selling Shareholders gave loans to the Plan;

    x.    Whether Selling Shareholders knowingly participated in the prohibited stock transaction;

    xi.    The amount of losses suffered by the Plan and its participants as a result of the Trustee's ERISA violations; and

    xii.    The appropriate relief for Defendants' violations of ERISA.

145.    Plaintiff's claims are typical of those of the Class. For example, Plaintiff, like other Plan participants in the Class, suffered a diminution in the value of her Plan account because the Plan paid above fair market value and took on excessive loans for ACCT stock, resulting in her being allocated fewer shares of stock, and she continues to suffer such losses in the present because the Trustee failed to correct the overpayment by the Plan.

146.    Plaintiff will fairly and adequately represent and protect the interests of the Class. Plaintiff has retained counsel competent and experienced in complex class actions, ERISA, and employee benefits litigation.

147.    Class certification of Plaintiff's Counts III, IV, and V Claims for Relief for the alleged violations of ERISA is appropriate pursuant to Fed. R. Civ. P. 23(b)(1) because adjudications with respect to individual Class members would as a practical matter be dispositive of the interests of non-party Class members, and/or because the prosecution of separate actions by individual Class members would create a risk of inconsistent or varying adjudications which would establish incompatible standards of conduct for Defendants.

148.    The names and addresses of the Class members are available from the Plan. Notice will be provided to all members of the Class to the extent required by Fed. R. Civ. P. 23.

## PRAYER FOR RELIEF

Wherefore, Plaintiff prays for judgment against Defendants and for the following relief:

A.    Declare that Defendant Trustee caused the Plan to engage in prohibited transactions and thereby breached its duties under ERISA;

B.    Declare that Defendant Trustee breached its fiduciary duties under ERISA to the Plan and the class members;

C.    Declare that Selling Shareholders knowingly participated in a prohibited transaction with the Plan in violation of ERISA;

D.    Order Defendants to make good to the Plan and/or to any successor trust(s) the losses resulting from the violations of ERISA and disgorge any profits they made through use of assets of the Plan;

E. Order reformation of the ESOP Transaction contracts to provide the Plan pays no more than fair market value for ACCT stock as of the date of the transaction, to provide the Plan receives that for which it paid including control of ACCT where it did not receive a discount for lack of control and paid on a control basis and did not obtain control of ACCT, and any other appropriate reformation;

F. Order rescission of the ESOP Transaction;

G. Order that Defendants provide other appropriate equitable relief to the Plan and its participants and beneficiaries, including but not limited to surcharge, providing an accounting for profits, and imposing a constructive trust and/or equitable lien on any funds wrongfully held by Defendants;

H. Order the proceeds of any recovery for the Plan to be allocated to the accounts of the class members to make them whole for any injury that they suffered as a result of the breaches of ERISA in accordance with the Court's declaration;

I. Order the allocation to the accounts of the class members of the additional shares of stock that would have been allocated but for the Plan's overpayment on company stock and Defendants' breaches of ERISA;

J. Remove the Trustee as Plan fiduciary, enjoin it from acting as a fiduciary for any employee benefit plan that covers or includes any ACCT employees or members of the Class, and appoint an independent fiduciary in place of the Trustee;

K. Award Plaintiff reasonable attorneys' fees and costs of suit incurred herein pursuant to ERISA § 502(g), 29 U.S.C. § 1132(g), and/or for the benefit obtained for the common fund;

L.    Enjoin Defendants from dissipating any of the proceeds they received from the Transaction held in their actual or constructive possession until the Plan participants' rights can be adjudicated;

M.    Enjoin Defendants from transferring or disposing of any of the proceeds they received from the Transaction to any person or entity, which would prejudice, frustrate, or impair the Plan's and Plan participants' ability to recover the same;

N.    Order Defendants to pay prejudgment and post-judgment interest;

O.    Certify this action as a class action pursuant to Fed. R. Civ. P. 23, certify the named Plaintiff as class representative, and her counsel as class counsel; and

P.    Award such other and further relief as the Court deems equitable and just.

Dated:  November 7, 2024

**BAILEY & GLASSER LLP**

*/s/ Patricia Mulvoy Kipnis*
Patricia Mulvoy Kipnis (PA Bar No. 91470)
923 Haddonfield Road, Suite 300
Cherry Hill, NJ 08002
Telephone: (215) 274-9420
Facsimile: (202) 463-2103
pkipnis@baileyglasser.com

Gregory Y. Porter (*pro hac vice* to be filed)
Ryan T. Jenny (*pro hac vice* to be filed)
1055 Thomas Jefferson Street, NW, Suite 540
Washington, DC 20007
Telephone: (202) 463-2101
Facsimile: (202) 463-2103
gporter@baileyglasser.com
rjenny@baileyglasser.com

Peter K. Stris (*pro hac vice* to be filed)
**STRIS & MAHER LLP**
777 S Figueroa St., Ste. 3850
Los Angeles, CA 90017
Telephone: (213) 995-6800
Facsimile: (213) 261-0299
pstris@stris.com

*Attorneys for Plaintiff Deanna R. LeDuc*